UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA      )
                              )
          v.                  )  CRIMINAL ACTION
                              )  NO. 09-10048-WGY
DAQUAWN JONES,                )
                              )
              Defendant.      )
                              )
```

MEMORANDUM

December 30, 2010

YOUNG, D.J.

On June 10, 2010, after a four-day trial, Daquawn Jones ("Jones") was convicted of conspiracy to distribute crack cocaine and distribution of .62 grams of crack cocaine within 1000 feet of a school.  A career offender, Jones was sentenced by this Court to 10 years in prison.  A routine case?  Hardly.

## I.   IDENTIFICATION

This case turns on the identification of Jones as the person who set up the drug transaction in question.  In the constitutional sense, the identification of Jones could hardly have been more suggestive, but even a suggestive identification does not ipso facto require suppression.  See Manson v. Brathwaite, 432 U.S. 98, 104 (1977); Neil v. Biggers, 409 U.S 188, 199 (1972); Simmons v. United States, 390 U.S. 377, 385-86 (1968); Stovall v. Denno, 388 U.S. 293, 301-02 (1967).

Here, defense counsel timely moved for suppression. After a thorough evidentiary hearing, the Court found that, following his standard operating procedure, Massachusetts State Trooper David Patterson ("Patterson"), a white male acting in an undercover capacity and posing as a retail drug purchaser, was roving selected areas of Brockton seeking to engage in modest drug transactions. Patterson was driving a pick-up truck specially equipped with a hidden video camera to record individuals (such as drug sellers) approaching his open driver's side window. In order for this scam to work, Patterson naturally did not know the individuals with whom he dealt nor did they know him. On a good day, Patterson could make a number of buys in this fashion. At the end of the day, Patterson turned a copy of the videotape over to Brockton police officers who patrolled the area through which he had driven to see whether, given their familiarity with the area and its inhabitants as well as local law enforcement intelligence, they could identify anyone on the videotape. Thereafter, such officers would show Patterson **a single photo** and ask him if he could identify the individual as a person he'd seen selling drugs at the specific time and place. Not surprisingly, using this procedure Patterson made affirmative identifications over 90% of the time.

So it was here. On June 19, 2008, Patterson was trolling for prospective drug sellers in Brockton. He set up such a

transaction through a discussion with a black male who he observed across a residential street. This individual then entered the passenger side of a nearby sedan that promptly drove away, and a second individual, later identified as Johnny Richmond, approached Patterson's truck and exchanged .62 grams of crack cocaine for cash through the driver's side window. What took this transaction out of the routine was the fact that, as the first individual was approaching Patterson's truck to set up the transaction, Patterson observed another vehicle evidently patrolling this area. Reasoning that this strange vehicle could be that of a citizen vigilante or a rival gang setting him up for robbery of the cash or drugs, Patterson went on high alert. Having completed this transaction, he sped from the area. When the strange vehicle followed him, he became apprehensive and called for police back-up.[1]

The videotape vividly captures Johnny Richmond approaching Patterson's driver's side window and completing the exchange. Earlier, it displays a most fleeting and out of focus image of another black male. By pausing the tape, one can discern the clothing of this individual and, based upon all the surrounding circumstances, this Court concluded a knowledgeable local police

---

[1] Although the police apparently stopped this other vehicle and arrested the driver, it was never satisfactorily explained who the driver was, why he was patrolling the area, or why he followed Patterson.

officer could make an identification of that individual. Trooper Erik Telford ("Telford"), a member of a State Police gang unit surveiling this area of Brockton, identified this individual as Daquawn Jones and later showed a single photo of Jones to Patterson, who likewise identified Jones as the individual who had set up the drug transaction in question.[2]

At the conclusion of the hearing of the motion to suppress, after hearing the arguments of counsel and considering all the evidence, this Court, although disapproving the procedure followed here, nevertheless, "unsupported by any literature or social science findings," reasoned that Patterson's heightened awareness of his surroundings due to the presence of the strange vehicle, his concentration on the suspects given his mission, his proximity to the black male across the street, the well lit area, and the short time that elapsed between the observation and the identification rendered his identification of Jones reliable and not the product of the suggestive procedures followed here.

---

[2] I defy anyone unfamiliar with Daquawn Jones to identify him from the videotape alone. Since it is now all the rage for appellate courts to review such primary evidence and draw their own conclusions, Scott v. Harris, 550 U.S. 372 (2007); Dan M. Kahan, Whose Eyes Are You Going to Believe? Scott v. Harris and the Perils of Cognitive Illiberalism, 122 Harv. L. Rev. 837 (2009); Amelia G. Yowell, Race to Judgment? An Empirical Study of Scott v. Harris and Summary Judgment, 85 Notre Dame L. Rev. 1759 (2010), it is important to recall that Telford was quite familiar both with Jones and the area of the transaction, and Patterson observed Jones across a sunlit street for considerably longer than the fleeting image on the videotape.

Accordingly, the Court denied the motion to suppress, and at trial both Patterson and Telford testified to their observations.

At trial, however, defense counsel had sociological evidence – in spades. Defense counsel proffered the testimony of Steven Penrod as an expert in eyewitness testimony.

I have taught evidence for years and have considered this issue and raised it with my classes ever since I learned of the pioneer in this field, Elizabeth Loftus. The issue, of course, is that the sociology of eyewitness identification constitutes "reliable principles" as that phrase is used in Federal Rule of Evidence 702, but such witnesses (as here) typically have no case-specific knowledge whatsoever and seek to testify about matters upon which we have long relied on the common sense judgment of the American jury. See generally William G. Young, Reflections of a Trial Judge 130-131 (MCLE 1998). The best I could do as a teacher was to highlight the issue and point out that some judges go one way, see, e.g., United States v. Montas, 41 F.3d 775, 785 (1st Cir. 1994) (Coffin, J.) (holding that expert testimony on a subject within the jury's ordinary experience has little probative value); United States v. Rahm, 993 F.2d 1405, 1413 (9th Cir. 1993) (Reinhardt, J.) (concluding that areas of common knowledge are an improper basis for expert testimony); United States v. Cruz, 981 F.2d 659, 664 (2d Cir. 1992) (Winter, J.) (holding that expert testimony is admissible

only if the subject is, at least in part, esoteric), and some the other, see, e.g., United States v. Brien, 59 F.3d 274, 276 (1st Cir. 1995) (Boudin, J.) (holding that an expert can provide background information even as to an issue within the jurors' common knowledge); United States v. Larkin, 978 F.2d 964, 971 (7th Cir. 1992) (Flaum, J.) (allowing expert testimony that will help the jury to better understand the evidence); United States v. Downing, 753 F.2d 1224, 1229 (3d Cir. 1985) (Becker, J.) (holding that, even if an issue is not beyond the ordinary understanding, expert testimony may help the trier of fact to understand difficult evidence).

Now, after 33 years as a trial judge, I had to resolve the issue. I did so. Here's how:

## A.  Legal Standard

Federal Rule of Evidence 702[3] allows the admission of expert testimony where the witness is sufficiently qualified to assist the trier of fact, and his testimony is relevant to the task at

---

[3] Federal Rule of Evidence 702 states in full:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably fo the facts of the case.

hand and rests on a reliable basis. United States v. Stokes, 388 F.3d 21, 26 (1st Cir. 2004), vacated on other grounds, 544 U.S. 917 (2005) (quoting United States v. Diaz, 300 F.3d 66, 73 (1st Cir. 2002)). The admission of expert testimony on eyewitness identification is a prickly matter because "[b]roadly speaking, [it] involve[s] a credibility determination within the ken of the ordinary judge and juror - unlike, say, DNA identification." United States v. Brien, 59 F.3d at 276. While such testimony can "give the jury background information about the mechanism of memory, types of errors, error rates, and other information not commonly possessed by the jury - information that may even be at odds with what a judge or juror might expect. . . . [H]elpfulness is a matter of degree, and expert evidence involves costs and risks." Id. at 276-77.

As such, the First Circuit has refused to adopt a blanket rule that qualified expert testimony on eyewitness identification must routinely be admitted or excluded.[4] United States v. Rodríguez-Berríos, 573 F.3d 55, 71 (1st Cir. 2009). Rather, trial courts must determine the admissibility of such expert

---

[4] While the Third and Sixth Circuits have taken a rather liberal view towards the admissibility of expert eyewitness testimony, the First, Fourth, Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits hold that it is within the district court's discretion to exclude such testimony. The Second Circuit holds that expert psychological testimony usurps the jury's role of determining witness credibility. See John P. Rutledge, They All Look Alike: The Inaccuracy of Cross-Racial Identifications, 28 Am. J. Crim. L. 207, 218 (2001) (citing cases).

testimony on a case-by-case basis, taking into consideration "the reliability and helpfulness of the proposed expert testimony, the importance and the quality of the eyewitness evidence it addresses, and any threat of confusion, misleading of the jury, or unnecessary delay."  Id. (quoting Brien, 59 F.3d at 277).

**B.    The Merits**

In this case, the government does not challenge the qualifications of Dr. Penrod, nor the validity of the research and scientific literature upon which his testimony would be based.  Rather, the government argues that the proffered testimony is inadmissible because it is within the common understanding of the trier of fact, Fed. R. Evid. 702, and further, has the potential to confuse or mislead the jury, Fed. R. Evid. 403.  Meanwhile, Jones contends that the probative value of expert identification testimony outweighs concerns of delay and confusion because eyewitness testimony is the sole evidence against Jones and because Penrod's testimony defies lay perceptions regarding eyewitness identification.

At trial, the defense offered Penrod's testimony regarding the decreased accuracy of cross-racial eyewitness identifications relative to same-race identifications, the effect of stress on an individual's ability to make an accurate identification, the weak relationship between a witness's confidence in his identification and accuracy, and the suggestive impact that various practices

8

may have on an identification procedure. Through this testimony, the defense sought to show that Patterson's identification was suspect because: he and Jones are of different races; Patterson was subjected to an unusual amount of stress during the buy as a result of the potential danger posed by the unidentified vehicle; and the identification procedure was highly suggestive. While recognizing that the government's case rests primarily on eyewitness identifications and that the proposed testimony may reflect information outside the common understanding of laypersons, the Court excluded Dr. Penrod's testimony because it did not bear directly on the facts of this case and the same information was conveyed to the jury through instruction. The Court will explain its reasoning using the factors outlined in Brien.

As mentioned above, it is largely undisputed that the government's case relies primarily on the eyewitness testimony of Patterson and Telford. The evidence against Jones consisted of a blurry video where the suspect's face is not clearly visible, Telford's identification of Jones from the same video, and Patterson's identification of Jones from a single photograph 24 hours after an initial encounter with the suspect. Moreover, the cornerstone of Jones's defense is misidentification. The accuracy of Telford and Patterson's eyewitness identification is thus an essential issue in this case, favoring the admission of

expert testimony on eyewitness identification.  <u>See</u> <u>United States</u>
v. <u>Brownlee</u>, 454 F.3d 131, 141 (3d Cir. 2006) (remanding for new
trial because exclusion of identification expert significantly
undermined defendant's ability to challenge witnesses' confidence
in their identifications in a case turning primarily on accuracy
of identifications); <u>United States</u> v. <u>Smithers</u>, 212 F.3d 306, 317
(6th Cir. 2000) ("[E]xpert testimony should be admitted . . .
when there is no other inculpatory evidence presented against the
Defendant with the exception of a small number of eyewitness
identifications."); <u>United States</u> v. <u>Moore</u>, 786 F.2d 1308, 1313
(5th Cir. 1986) ("[I]n a case in which the sole testimony is
casual eyewitness identification, expert testimony regarding the
accuracy of that identification is admissible and properly may be
encouraged.").

Penrod's proffered testimony, however, appears to be of
limited helpfulness because it does not address directly the
particular facts of this case.  "[E]xpert testimony must be
relevant not only in the sense that all evidence must be
relevant, but also in the incremental sense that the expert's
proposed opinion, if admitted likely would assist the trier of
fact to understand or determine a fact in issue." <u>Ruiz-Troche</u> v.
<u>Pepsi Cola of P.R. Bottling Co.</u>, 161 F.3d 77, 81 (1st Cir. 1998).
Indeed, Rule 702 requires that an expert witness "appl[y] the
[scientific] principles and methods reliably to the facts of the

case." Fed. R. Evid. 702. Here, Penrod has never spoken with Telford or Patterson, and thus his testimony consists of generalized notions regarding the flaws of eyewitness testimony. Contra United States v. Hines, 55 F. Supp. 2d 62, 73 (D. Mass. 1999) (Gertner, J.) (holding expert eyewitness testimony admissible because "the fact that the expert has not interviewed the particular eyewitness makes it less likely that the jury will merely accept the expert testimony and more likely that the testimony will be appropriately cabined" and the "witness can only be providing the jury with tools to analyze the eyewitness; he has no more specific information").

Moreover, the psychological studies which form the basis of Penrod's testimony do not appear to address a situation where a trained police officer approaches an encounter with the very purpose of identifying the suspect. The district court's decision in United States v. Nguyen, 793 F. Supp. 497 (D.N.J. 1992), is illustrative. There, a Vietnamese defendant allegedly sold a firearm to an African-American undercover officer, who subsequently identified the defendant from an array of photographs. Id. at 502-03. The defense sought to call Penrod to testify about cross-racial identifications, the correlation between confidence and accuracy, and the effect of stress on identifications. Id. at 507. The court ruled that testimony regarding cross-racial identification impairment was inadmissible

because "the facts of [the] case did not fit with the proffered Penrod testimony." Id. at 516. The court noted that unlike the subjects (Caucasian college students with limited contact with African-Americans) in psychology studies, the officer in the case was familiar with the Vietnamese subjects, had a higher degree of attentiveness, had a much longer time to view the defendant, and knew in advance that he would have to identify the seller. Id. Penrod admitted in voir dire that such factors would promote a significant reduction in cross-racial impairment, and the court thus held that Penrod's testimony was not relevant to the identification. Id.

Similarly here, Patterson was an undercover agent whose job it was to conduct drug buys and subsequently identify the suspect. Unlike the subjects of the studies that Penrod cites - convenience store workers who were called upon to identify customers to whom they had sold a product or given directions earlier in the day - Patterson went into the encounter with the purpose of making an identification, had ample opportunity to view the target, and most likely had greater attentiveness. See Penrod Aff. 7. The other study cited by Penrod in his affidavit - a review of the data from thirty-nine research articles, showing that the chance of mistaken identification is 1.56 times greater in other-race than in same-race conditions - does not contain the details of the experiments. See id. On this record,

the basis of Penrod's testimony regarding cross-racial impairment does not sufficiently fit the facts of this case.

With respect to Penrod's proffered testimony that stress impairs one's ability to make an identification, the Nguyen court noted that Penrod testified in voir dire that certain amounts of stress can increase performance, that experience with a stressor will generally decrease the impact of heightened levels of stress, and that the awareness of need to make a subsequent identification would reduce the effect of stress. Nguyen, 793 F. Supp. at 518. The Nguyen court held the testimony inadmissible because unlike the subjects of the studies, the officer in that case was an experienced investigator who had been on many undercover assignments involving guns, was not a victim of a crime but rather engaged in a business transaction with the seller, and was not surprised by the gun. Id. at 519.

In this case, Patterson was arguably subjected to heightened levels of stress. He admitted feeling surprised and potentially endangered by the unidentified vehicle driving around the block. Like the eyewitness in Nguyen, however, Patterson is an officer with significant undercover experience, who conducted the transaction with the very purpose of identifying the suspect. The subjects of the studies cited in Penrod's affidavit are perhaps more similar to crime victims than officers engaged in an undercover transaction. The subjects were, one, taken by

13

surprise by the target they were later asked to identify and, two, likely less focused on remembering the target's appearance as they were unaware of the need to make a future identification. Penrod Aff. 5. Thus, the record does not support the conclusion that Penrod's testimony would bear directly on this case where Patterson was engaged in a planned buy with the suspect, intended to make a future identification, and has been trained to handle stressful situations during such transactions.

That the bases for Penrod's testimony do not fit squarely within the facts of this case, however, does not mean that such information is not in any way helpful to the jury. This is especially true in a case such as this where eyewitness identification is a critical issue. The problem of eyewitness misidentification has long been recognized. See <u>United States</u> v. <u>Wade</u>, 388 U.S. 218, 228 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. . . . The hazards of such testimony are established by a formidable number of instances in the records of English and American trials."). <u>See</u> Sandra Guerra Thompson, <u>Judicial Blindness to Eyewitness Identification</u>, 93 Marq. L. Rev. 639 (2009). The Innocence Project has reported that mistaken eyewitness identifications contributed to more than 75% of the more than 200 wrongful convictions in the United States that have been overturned on the

basis of DNA evidence.  Innocence Project, <u>The Causes of Wrongful</u>

<u>Conviction</u>, Contributing Causes of Wrongful Convictions Chart,

<u>available at</u> http://www.innocenceproject.org/understand.

Contrary to the government's assertion, there is wide

consensus that psychological evidence regarding eyewitness

testimony is not only outside the common knowledge of juries, but

even defies common sense.  See <u>Brownlee</u>, 454 F.3d at 142

("[W]hile science has firmly established the inherent

unreliability of human perception and memory . . . this reality

is outside the jury's common knowledge, and often contradicts

jurors' commonsense understandings") (internal citations and

quotation marks omitted); <u>Smithers</u>, 212 F.3d at 316 ("Today,

there is no question that many aspects of perception and memory

are not within the common experience of most jurors, and in fact,

many factors that affect memory are counter-intuitive.");

<u>Downing</u>, 753 F.2d at 1231-32 ("[M]ost people, and hence most jury

members, probably believe that stress increases the accuracy of

one's perception"); <u>United States</u> v. <u>Smith</u>, 736 F.2d 1103, 1106

(6th Cir. 1984) (indicating that insight regarding cross-racial

identification is "outside the jury's 'ken'"); <u>Hines</u>, 55 F. Supp.

2d at 72 ("While jurors may well be confident that they can draw

appropriate inferences about eyewitness identification directly

from their life experiences, their confidence may be misplaced,

especially where cross-racial identification is concerned.").

Moreover, cross-examination of the eyewitnesses will have little effect on jurors if they analyze the evidence through their common-sense, often incorrect assumptions. For example, if jurors incorrectly assume that in general, high levels of stress enhance a witness's ability to remember a suspect, they will not be persuaded by defense counsel's efforts to establish that the witness was under a high level of stress during an encounter with the suspect. Therefore, background information regarding the areas of perception and memory would give jurors the tools more accurately to determine the credibility of an eyewitness.

Recognizing the helpfulness of such information and the limitations of cross-examination, the Court gave instructions in lieu of expert testimony regarding the four areas comprising Penrod's proposed testimony: cross-racial identifications, the effect of stress on identifications, the relationship between a witness's confidence and the accuracy of his identification, and suggestive identification procedures.[5] The Court's decision to

---

[5] In addition to the standard eyewitness instruction recommended in United States v. Telfaire, 469 F.2d 552 (D.C. Cir. 1972), this Court also provided the jury with the following instructions:

> You may take into account the strength of the later identification and the circumstances under which the later identification was made. . . . Was the photographic identification procedure conducted afterwards suggestive in any way. For example, an identification made when a witness chooses a photo from a group of photos tends to be more reliable than an identification made from a single photograph. It is

not forbidden by the law to identify from a single photograph.  But you heard the stipulation about [sic] we don't treat police officers any different, or at least there's nothing in the manuals that say treat police officers any different.  And I do tell you that it's generally believed that an identification of a person made from a group of photographs tends to be more reliable than one made from a single photograph.
. . .

You may consider these other things.  What was the witness's state of mind at the time of observation.  There are studies that show that if a witness is afraid, distracted, under stress, then the witness's capacity to perceive what he says he perceives and remember it, that's reduced.  Were the witness, the eyewitness witness and the person he's identifying, were they of different races.  There are studies that tend to show that when a witness and the person he is identifying are of different races the identification tends to be less reliable than if both persons are of the same race.  These studies reveal that even people with no prejudice against other races and people who have substantial contact with persons of other races will experience some difficulty in accurately identifying members of a different race.  And quite often people don't recognize this difficulty in themselves.

Lastly, or last on this list, you can also consider that studies show that the reliability of an identification doesn't really depend upon how positive the person is.  The reliability depends on all the circumstances.

Now, I make mention of studies . . . . studies are of groups of people, a statistically significant group of people generally.  They're not the people in this case.  No study has been done or could be conducted about the people in this case.  And you see that's what's left to the jury.  It's up to you decide.  I need you to understand the parameters, the strengths and the concerns of eyewitness testimony, but how that applies in this case is left to you under your oath as jurors.

Trial Tr., Jury Instructions 17-19; <u>see</u> Fed. Judicial Ctr., <u>Pattern Criminal Jury Instructions</u> 43-44 (1987); 1A Fed. Jury Prac. & Instr. § 14:10 (6th ed. 2010).

instruct the jury on these matters diminishes what helpfulness or relevance Penrod's expert testimony would have had in the "incremental sense." <u>Ruiz-Troche</u>, 161 F.3d at 81. Instructing the jury regarding the potential flaws of eyewitness testimony provided them with knowledge that may be contrary to their common-sense notions while avoiding some of the pitfalls of expert testimony.

The costs of expert testimony are especially high in cases such as this, where the proposed opinion involves the trial process itself. Such costs include the potential neutralizing effect of dueling psychological experts, the complicated nature of social science data that may leave jurors more confused than enlightened, and substantial delay in trials. <u>See</u> <u>United States</u> v. <u>Hall</u>, 165 F.3d 1095, 1119 (7th Cir. 1998) (Easterbrook, J., concurring). Thus, as Judge Easterbrook has recognized, "a trial <u>about the process of trials</u> would not only divert attention from the main question and substantially lengthen the process but also would not do much to improve the accuracy of the outcome." <u>Id.</u> (emphasis in original). Moreover, it would always be possible to offer expert testimony regarding empirical propositions upon which the adversarial system relies. <u>See</u> <u>id.</u> Rather than making such empirical propositions debatable issues in every case, Judge Easterbrook advocates incorporating lessons learned from social science into the trial process itself, via

jury instructions or legal rules about arguments.[6] Id. at 1120.

Indeed, this approach appears to be the most appropriate in this

case, as the general information contained in Penrod's proffered

testimony was not so complex that it could not effectively be

conveyed to the jury through instruction.

Therefore, in light of its limited incremental relevance,

the Court's jury instruction, and the costs of expert testimony

regarding the trial process, the Court excluded Penrod's

---

[6] For example, in the context of cross-racial
identification, the American Bar Association recommends the use
of jury instructions where a trial judge finds sufficient risk of
misidentification based on cross-racial factors.  See Steven
Saltzburg, American Bar Association Policy 104D: Cross-Racial
Identification, 37 Sw. U. L. Rev. 917 (2008) (discussing the
usefulness of expert testimony and jury instruction to decreasing
erroneous convictions and providing several model cross-racial
jury instructions); see also Telfaire, 469 F.2d at 559-61
(Bazelon, C.J., concurring) (advocating the use of model cross-
racial identification instruction).  Moreover, some states either
authorize or require a cross-racial identification instruction.
See, e.g., People v. Wright, 755 P.2d 1049, 1139-44 (Cal. 1988)
(holding that instruction listing factors jury may consider in
evaluating an eyewitness identification, including its cross-
racial nature, should be given when identification is a central
issue and there is no substantial corroborative evidence);
Commonwealth v. Hyatt, 419 Mass. 815, 818 (1995) (recognizing
that cross-racial jury instruction may be appropriate at the
judge's discretion); State v. Cromedy, 158 N.J. 112, 132 (1999)
(holding that cross-racial instruction should be given only when
identification is a central issue in the case and the
identification is not corroborated by other evidence giving it
independent reliability); State v. Long, 721 P.2d 483, 492 (Utah
1986) (mandating trial courts give cautionary instruction
whenever eyewitness identification is central issue and requested
by defense, with race being one factor that a "proper"
instruction should include, but giving latitude to courts and
counsel).

proffered testimony and instead gave the strong instruction set out in footnote 5.

## II.  SENTENCING

The sentencing of criminal offenders is governed by 18 U.S.C.§ 3553(a).  In this session of the Court, sentencing proceeds in four steps.  See United States v. Kandirakis, 441 F. Supp. 2d 282 (D. Mass. 2006).

First, the Court determines, pursuant to the principles of "constitutional Booker," United States v. Booker, 543 U.S. 220 (2005) (Stevens, J., opinion for the Court), the highest sentence the Court might impose given the facts admitted on a plea (not involved here) or found by the jury.[7]  Given our present quasi-determinant national sentencing policy, this maximum sentence is the highest guideline sentence (without regard to any mitigating adjustments) derived from the facts admitted or found.

Here, although he is but 20 years old, Jones is already a career offender.  Defense counsel challenges categorizing Jones as a career offender but recognizes that, in this circuit, as his

---

[7] This Court tries all factual sentencing enhancements to the jury upon actual proof beyond a reasonable doubt, Jones v. United States, 526 U.S. 227, 243-48 (1999), a procedure expressly approved by Justices Scalia and Thomas, citing this Court's decision in United States v. Griffin, 494 F. Supp. 2d 1, 12-14 (D. Mass. 2007), vacated by 524 F.3d 71 (1st Cir. 2008).  See Rita v. United States, 551 U.S. 338, 368, 373, 378 n.5 (2007) (Scalia and Thomas, JJ., concurring in part and concurring in the judgment).  There are no factual sentencing enhancements involved in this case.

juvenile convictions count against him, United States v. Torres,
541 F.3d 48, 51-53 (1st Cir. 2008), he is properly so
characterized.[8]  Accordingly, the maximum sentence to which Jones
could have been sentenced is 327 months.  Sentencing Transcript,
Nov. 18, 2010 ("Sent. Tr."), at 8.

Second, the Court determines the average sentences imposed
on offenders for like offenses.  The Court in no sense sentences
from such averages, but uses them to determine the weight to be
accorded to the advisory sentencing guidelines.

According to the national database maintained by the United
States Sentencing Commission and publicly available, the average
sentence imposed for drug trafficking nationwide is 82 months and
in the First Circuit is 73 months.  Sent. Tr. at 9.  These
averages are helpful in that they include a large number of
criminal sentences but unhelpful in that they lump together all
types of drug convictions without regard to those who drew
mandatory sentences, were career offenders, or were armed career
criminals.  Sent. Tr. at 9.

---

[8] Recently, when confronted with the issue whether a
defendant's youthful offender adjudication counted as a prior
felony conviction for career offender status purposes, Judge
Boudin noted the court's obligation to follow Torres as
controlling law in the First Circuit, but held that the
defendant's "opportunity to seek en banc reconsideration to
challenge Torres is duly preserved."  United States v. McGhee,
2010 WL 4943108, *7 (1st Cir. Dec. 7, 2010).

The confidential database of the Probation Office of the
District of Massachusetts includes a smaller, more focused subset
of convictions post-<u>Booker</u> and reveals an average sentence of 60
months within this District.  It too does not differentiate among
those who received mandatory sentences, career offenders, and
armed career criminals.

Donald Womack, the superb court reporter assigned to this
session, maintains a fully searchable, publicly available
database of all this Court's post-<u>Booker</u> sentences and the
statement of reasons therefor.  This database has the great
advantage of isolating each individual sentence and informing
this Court's discretion (and I check it before each sentencing
hearing), but it contains so few sentences that it is hardly a
meaningful average.[9]  In any event, this database reveals an

_____

[9] Sentencing is a core judicial function and, save for the
protection of offenders, its every aspect ought be public.  <u>Ex
Parte United States</u>, 242 U.S. 27, 41 (1916); <u>United States</u> v.
<u>Johnson</u>, 48 F.3d 806, 808 (4th Cir. 1995); Steven L. Chanenson,
<u>Write On!</u>, 115 Yale L.J. Pocket Part 146, 147-48 (2006); Marc L.
Miller, <u>A Map of Sentencing and a Compass for Judges: Sentencing
Information Systems, Transparency, and the Next Generation of
Reform</u>, 105 Colum. L. Rev. 1351, 1357 (2005).
     Imagine the richly nuanced common law of sentencing that
would emerge were every judge as well served as is this session
by Court Reporter Donald Womack.  Alone among 94 district courts,
the District of Massachusetts routinely makes public the
statements of reasons behind its sentences.  <u>United States</u> v.
<u>Whigham</u>, 2010 WL 4959882, *11 (D. Mass. Dec. 3, 2010) (Gertner,
J.); <u>compare</u> Ryan W. Scott, <u>Inter-Judge Sentencing Disparity
After </u>Booker<u>: A First Look</u>, 63 Stan. L. Rev. 1, 21-41 (2010)
(noting the District of Massachusetts' unique transparency in
sentencing and discussing inter-judge sentencing disparity with
reference to following the sentencing guidelines), <u>with</u> <u>Whigham</u>,

2010 WL 4959882, *2, *11-13 (patiently explaining the flaws in Scott's premise and discussing principled reasons for inter-judge differences).  Scott's law review article grew out of an earlier version, Ryan W. Scott, The Effects of Booker on Inter-Judge Sentencing Disparity, 22 Fed. Sent'g Rep. 104 (2009).

It is somewhat ironic (but understandable) that Massachusetts' unique transparency in sentencing enabled Scott's articles even though several other judicial districts (which keep their sentencing data secret) stray more frequently than Massachusetts from the advisory sentencing guidelines.  Compare the District of Massachusetts (34.9% of sentences are within the guideline range), with the District of Vermont (30.8%); the Southern District of Ohio (33.3%); the District of Minnesota (32.1%); the Central District of California (32.3%).  U.S. Sentencing Comm'n, 2009 Sourcebook of Federal Sentencing Statistics, Table 26 (2009), available at http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Source books/2009/Table26.pdf.

The publication of Scott's law review article resulted in a surprisingly shallow lead story in The Boston Globe with the sub-heading "Analyst . . . alleges bias risk" and mentioning "politics" as a factor in sentencing.  Jonathan Saltzman, Disparity Cited in Sentence Lengths, Boston Globe, Dec. 20, 2010, at A1.  The actual Scott article develops neither point.  Fox News followed with a far more balanced and nuanced piece, Gene Lavanchy, Legally Speaking: Sentencing Guidelines, Fox25 Morning News (Dec. 21, 2010), http://www.myfoxboston.com/dpp/morning/legally-speaking-sentencin g-guidelines-20101221, and the next day Derrick Jackson opined that "it's a welcome sign that at least some judges are responding in a common-sense way to legal disparities that are enshrined in federal law," Derrick Z. Jackson, A Trend Toward Fairer Sentences, Boston Globe, Dec. 21, 2010, at A19.  See generally Wendy Kaminer, Mandatory Sentences and Myths of Equal Justice, The Atlantic (Dec. 22, 2010, 10:40 AM), http://www.theatlantic.com/national/archive/2010/12/mandatory-sen tences-and-myths-of-equal-justice/68399/ ("Advocates for mandatory guidelines . . . still argue misleadingly that they limit arbitrariness and discretion in sentencing.  They do not. They transfer sentencing discretion from judges to prosecutors."); Peter B. Krupp, Letter to the Editor, Disparity Among Judges Better Than Forced Lockstep, Boston Globe, Dec. 27, 2010).  Transparency is not so bad after all.

The point is not that judges stray from the sentencing guidelines.  That is both expected and unremarkable.  Rather, the point is - and this cannot be repeated too often - to ask whether

average sentence of 190 months (6 sentences) imposed by this
Court upon the conspiracy offense and 153 months (9 sentences) on
the distribution offense.

Third, the Court accurately calculates the guideline
sentence as continues to be required by the law, even though the
guideline calculation itself is advisory. <u>Booker</u>, 543 U.S. 220,
259 (2005) (Breyer, J., opinion of the Court) ("Without the
'mandatory' provision, the Act nonetheless requires judges to . .
. consider the Guidelines 'sentencing range established for . . .
the applicable category of offense committed by the applicable
category of defendant.") (internal citations omitted). Here,
since Jones is a career offender, the guidelines advise a
sentence of 262-327 months. Sent. Tr. at 12.

As is evident from the above recital, the first three steps
are somewhat arithmetic. In a truly advisory guidelines system,
it is the fourth step that is the most important. For it is
during this step that a fair, impartial, and individual sentence
– mindful both of the needs of society and the circumstances of
the individual offender – is hammered out pursuant to 18 U.S.C.
§ 3553(a).

---

inter-judge sentencing disparities rest on actual case-specific
factual differences, such as offense conduct, criminal history,
impact on victims and society, and the offender's personal and
social history. Judges wrestle with these questions every day.
They are hard. There are no definitive answers.

Defense counsel mounted a direct frontal assault on the career offender guideline, arguing that it lacks any empirical support and, at least as to low-level drug sellers, fails to accomplish its deterrent purpose. Defense counsel therefore urged this Court simply to reject the career offender guideline in a "categorical policy disagreement" as recognized by the First Circuit in <u>United States</u> v. <u>Boardman</u>, 528 F.3d 86, 87 (1st Cir. 2008) (citing <u>Kimbrough</u> v. <u>United States</u>, 552 U.S. 85 (2007)). <u>See</u> Carissa Byrne Hessick, <u>Appellate Review of Sentencing Policy Decisions After</u> Kimbrough, 93 Marq. L. Rev. 717 (2009).

Respectfully, this Court disagrees. There is nothing conceptually wrong with the career offender guideline. Incarceration is a blunt tool at best. First-time non-violent offenders ought receive the benefit of every rehabilitative program a court can devise. Thirty-three years of judicial experience, however, convinces me that higher sentences for repeat offenders are both appropriate and necessary. Regretably, some offenders "simply don't get it."[10]

---

[10] For example, I once sentenced an individual who was so unclear on the concept that he threatened me with death. I said:

> You threaten me? How little you understand us. We are Americans. There are a thousand times a thousand American men and women ready and able to sit here. And every single one of them is younger, stronger, and smarter than I am.

Sadly, today I can no longer use this line. The Judicial Conference of the United States, without discussion or debate,

Here, Jones is a prototypical career offender.  A member of
the Grant Street gang, he has been convicted of various minor
offenses, a requisite number of which constitute crimes of
violence.  Prosecution of the members of the Grant Street gang
has resulted in a marked diminution in drug trafficking and drug
violence in that area of Brockton.[11]

---

has declared the judicial seat I occupy surplusage.  See Report
of the Proceedings of the Judicial Conference of the United
States 23 (March 17, 2009).  Thus today, should that unhappy
threat be realized, it is the official position of the Judicial
Conference that the courtroom where I have sat for over a quarter
century will go dark, and the flag of the United States of
America which has flown there so proudly for every day of the
Court's sitting will be taken down.

[11] Defense counsel vigorously challenges the Court's
reliance on any data concerning the Grant Street gang, pointing
out that none of this data has been subjected to an adversarial
evidentiary hearing.  Defense counsel is correct, but her view is
beside the point.
     Data in the pre-sentence report is hardly evidence.  Indeed,
frequently it is a melange of multi-level hearsay written up from
the government's viewpoint.  To talk about proof by a
preponderance of the evidence, U.S. Sentencing Guidelines Manual
§ 6A1.3, Commentary (2004), based on such data, see e.g., United
States v. Villareal-Amarillas, 562 F.3d 892, 898 (8th Cir. 2009);
United States v. Curran, 525 F.3d 74, 78 (1st Cir. 2008); United
States v. Fisher, 502 F.3d 293, 306-08 (3d Cir. 2007); United
States v. Brika, 487 F.3d 450, 460-62 (6th Cir. 2007); United
States v. Reuter, 463 F.3d 792, 793 (7th Cir. 2006); United
States v. Vaughn, 430 F.3d 518, 525 (2d Cir. 2005), is worse than
sophistry, it denigrates the genuine fact-finding processes of
the federal district courts and marginalizes the American jury.
William G. Young, A Lament for What Was Once and Yet Can Be, 32
B.C. Int'l & Comp. L. Rev. 305, 314 (2009).
     But what of it?  This type of raw unfiltered data is what we
expect prosecution and defense counsel to proffer at the time of
sentencing.  True, the probation officer, as a Court employed
neutral, applies some filter to this data but, while this is an
aid to the Court, it hardly qualifies as fact-finding.  This
Court continues to do as it has always done – apply its own

Nevertheless this Court varied downward from the low-end of the advisory career offender sentencing guidelines (232 months) and imposed a sentence of ten years (120 months). While the Court considered every one of the Section 3553(a) factors, two aspects of this sentence were the major determinants.

## A.  Need for Sentence Similar to Related Cases

All sentencing is local.  <u>See</u> <u>United States</u> v. <u>Rodriquez</u>, 527 F.3d 221, 230 (1st Cir. 2008) (holding that a district court may consider district-specific sentencing data in its sentencing calculus); <u>United States</u> v. <u>Politano</u>, 522 F.3d 69, 73-74 (1st Cir. 2008) (indicating that, post-<u>Booker</u>, localized sentencing responses are appropriate).  Acknowledged or not, most judges are alert to the sentences imposed by their own colleagues on similarly situated offenders in related cases.[12]  I know I am. In sentencing, I am an unabashed "crowd-to-the-middle" judge.

This Court acknowledges and adopts in full the nuanced approach of my distinguished colleague Nancy Gertner as expressed

---

judgment, experience, and common sense to such data to determine whether to sentence **below** the highest sentence authorized by the guideline on the basis of facts proven to the jury beyond a reasonable doubt at trial.

[12] In this District, we expect such data to be included in every pre-sentence report, both as to pending and resolved cases that the probation officer considers related.  Indeed, some judges go further to obtain additional comparative data about other defendants.  <u>See e.g.</u>, <u>United States</u> v. <u>Garrison</u>, 560 F. Supp. 2d 83, 84 (D. Mass. 2008) (Gertner, J.).

in <u>Whigham</u>, 2010 WL 4959882.  Specifically, I agree with her that:

> If I am to be concerned under the Sentencing Guidelines with similarly situated offenders who have been accused of similar conduct, it seems to me that the best place to look is to the people who have been arrested in the same sweep, in the same place, at the same time, largely charged with doing the same thing.  <u>See, e.g.</u>, Ryan Scott Reynolds, <u>Equal Justice Under Law: Post-Booker, Should Federal Judges Be Able to Depart From the Federal Sentencing Guidelines to Remedy Disparity Between Codefendants' Sentences?</u>, 109 Colum. L. Rev. 538 (2009) (concluding that <u>Booker</u> permits judges to consider codefendant disparity under § 3553(a)(6)).

<u>Id.</u> at *10.

Here, there is no real dispute but that there are eight such related cases.  The relevant particulars of each such case are set out in Appendix A.  Four of these other offenders are, like Jones, career offenders.  Yet only one, Johnny Richmond, received a guideline sentence and Richmond's prior offenses are far more severe than those of Jones.  Moreover, unlike Jones, it is clear that Rodney Galloway is one of the leaders of this gang.

The government properly points out that, but for Jones, everyone else pleaded guilty.  This, of course, does not account for the non-guideline sentences in four of these related cases as the discount for sparing the government the time and expense of a trial[13] is factored into the guideline calculation.  The

---

[13] Calling this discount one for "acceptance of responsibility" is just another example of the unfortunate sophistry woven into our guidelines system.  <u>United States</u> v.

28

government also points out that in certain of these related cases the defendants cooperated. The Court accepts that representation but finds it an excessively weak reed on which to ground a 232 month sentence of Jones (the government's recommendation) – a sentence which would be significantly higher than that of **anyone** in these related cases. Given Jones' lower level involvement in this conduct, such a sentence did not commend itself to this Court.

**B.    Severity of Career Offender Guidelines**

While the career offender guideline concept makes eminent sense, the actual career offender guideline calculation results in sentences which, for offenders like Jones, are breathtakingly severe. Absent his career offender status, Jones advisory guideline sentence would be 27-33 months; with it, his guideline sentence is 232-327 months.

This dramatic increase has caused the career offender guideline to be "widely criticized." Id. at *1. Moreover, its calculus in this district is especially problematic since in Massachusetts, unlike virtually every other state, a conviction for misdemeanor resisting arrest qualifies as federal felony.

A "prior felony conviction" means a conviction for an offense punishable for a term exceeding one year regardless

---

Green, 346 F. Supp. 2d 259, 271 (D. Mass. 2004), vacated in part, United States v. Yeje-Cabrera, 430 F.3d 1 (1st Cir. 2005), vacated, United States v. Pacheco, 434 F.3d 106 (1st Cir. 2006).

whether such offense is specifically designated as a felony by
the state statue.  U.S. Sentencing Guidelines Manual § 4B1.2,
Application Note 1 (2009).  In Massachusetts, misdemeanor
resisting arrest is a federal felony since it carries a sentence
of up to two and a half years in the house of correction.  <u>See</u>
<u>United States</u> v. <u>Weekes</u>, 611 F.3d 68, 72 (1st Cir. 2010); <u>see</u>
<u>also</u> <u>United States</u> v. <u>Stinson</u>, 592 F.3d 460 (3d Cir. 2010)
(interpreting the analogous crime under Pennsylvania statute, 18
Pa. Cons. Stat. § 5104, which also carries a term of two years,
<u>id.</u> at § 106(b)(7), as a categorical crime of violence and thus a
career offender predicate).  There appears to be only one other
state in which a similar conviction could count as a career
offender predicate.[14]  Thus treating Jones' conviction for
misdemeanor resisting arrest as a career offender predicate, when
all other states but two would not include it, tends toward
unwarranted disparity.  For example, someone in each of the other
First Circuit jurisdictions, Maine, New Hampshire, Rhode Island
or Puerto Rico, who has committed the same offense as Jones, with
the same record, would be at offense level 14, criminal history
category IV (based on 8 criminal history points), yet someone in

---

[14] The comparable Michigan statute, Mich. Comp. Laws §
750.479, carries a term of two years.  While it is not a
categorical crime of violence justifying career offender
sentencing, it may qualify as such where a defendant's actual
conduct in resisting arrest was violent.  <u>See</u> <u>United States</u> v.
<u>Blomquist</u>, 356 Fed. Appx. 882 (6th Cir. 2009).

Massachusetts would be at level 34, category VI, a potential sentencing difference of more than 19 years. Such disparity as to similarly situated offenders implicates the statutory mandates of 18 U.S.C. § 3553(a)(6). For these reasons and others, it is my impression that my colleagues and I depart or vary downward from the career offender guideline to a greater degree than any other guideline. Defense counsel argues that in Massachusetts the post-<u>Booker</u> departure and variance rate for this guideline approaches 89%.[15] Sent. Tr. at 27. Still, I am prepared to accept that the draconian sentences mandated by the career offender guideline have been largely discredited in Massachusetts.

If downward departure or variance is appropriate in this case – and I believe it is, how far ought the Court depart? This is the most difficult and offender-specific calculus of all. Is it more appropriate to calculate the departure from the bottom of the 232 month guideline range (the so-called "anchoring" to the guidelines principle of which the courts, <u>see e.g.</u>, <u>United States v. Docampo</u>, 573 F.3d 1091, 1105 n.5 (11th Cir. 2009); <u>United States v. Bohanon</u>, 290 F.3d 869, 876 (7th Cir. 2002), and commentators speak, Sarah M.R. Cravens, <u>Judging Discretion: Contexts for Understanding the Role of Judgment</u>, 64 U. Miami L. Rev. 947, 962 (2010); Jelani Jefferson Exum, <u>The More Things</u>

_____

[15] I can find no independent corroboration of this figure.

Change: A Psychological Case Against Allowing the Federal
Sentencing Guidelines to Stay the Same in Light of Gall,
Kimbrough, and New Understandings of Reasonableness Review, 58
Cath. U. L. Rev. 115, 125 (2008); Nancy Gertner, What Yogi Berra
Teaches About Post-Booker Sentencing, 115 Yale L.J. Pocket Part
127 (2006); Chris Guthrie, Jeffrey J. Rachlinski & Andrew J.
Wistrich, Inside the Judicial Mind, 86 Cornell L. Rev. 777, 787-
94 (2001); Kate Stith, The Arc of the Pendulum: Judges,
Prosecutors, and the Exercise of Discretion, 117 Yale L.J. 1420,
1496 (2008)?  Or will better justice be accomplished by
ratcheting up from top of the appropriate non-career offender
guideline out of deference to the congressional mandate which
gave rise the career offender concept?  28 U.S.C. § 994(h)
(mandating that a "career offender" as defined in the statute
receive a sentence at or near the maximum term authorized).  My
impression is that, absent cooperation, most post-Booker downward
departures or variances from the career offender guideline in
this District fall in the 8 to 15 year range.  See, e.g., United
States v. McGhee, 2010 WL 4943108, *2, *7 (affirming district
court's sentence of 8 years where the defendant's career offender
status was based, in part, on his youthful offender adjudication
for armed robbery and assault with a dangerous weapon).  My own
tend toward 15 years.

The calculus of averages and ranges at this stage of the analysis is, however, no longer appropriate. What is required is a focus on this particular offender and this particular crime in this particular social setting. This is the focus the Court pursued with counsel over 26 transcript pages as it weighed and balanced the various pertinent considerations. Sent. Tr. 12-38.[16] The transcript transparently illumines the Court's concerns, its aspirations, and its analysis in sentencing Jones. Here, it suffices to say only that, based on the considerations there discussed and developed, the concern over disparity among similarly situated offenders, and the requirement of 18 U.S.C. § 3553(a) that a sentence be no longer than necessary to accomplish its statutory purposes, this Court fashioned a fair and just 10 year sentence to be followed by eight years of supervised release. Aged 18 at the time of this offense, Jones will be nearly 36 years old when he is free from supervision. This is sufficient.

/s/ William G. Young
William G. Young
District Judge

---

[16] Sensing that the Court was not prepared to accept defense counsel's recommended 33 month sentence, she doggedly engaged the Court's analysis, trying to keep the sentence down. Government counsel, on the other hand, though equally able, felt constrained to stick to the advisory sentencing guidelines and thus was somewhat hamstrung when it appeared the Court was considering a downward departure.